[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On February 8, 2000, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of the mother and father of two brothers, Doyahn R., born August 6, 1992, and Evron R., born May 6, 1994. The boys have been in foster care since December 4, 1997, nearly three years. Yolanda R., mother, was served in hand with the petitions and Delray S., the father, whose whereabouts are unknown, was notified pursuant to an order of publication. Yolanda appeared and was appointed counsel; Delray never appeared and was defaulted. Trial on both petitions was held on October 23 and 25, 2000.
The petitions allege two statutory grounds for termination of Delray's parental rights, abandomnent and no ongoing parent-child relationship. One ground, failure to rehabilitate, is alleged for termination of Yolanda's parental rights. General Statutes § 17a-112 (c)(3), in pertinent part, provides for termination if "(A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the CT Page 14492 child;" and "(B)(1) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding. . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; and (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
Termination of parental rights proceeds in two stages: adjudication and disposition. In the adjudicatory phase, the court must determine whether the proof provides clear and convincing evidence that any one of the grounds pleaded exists to terminate parental rights as of the date of the filing of the petition or last amendment. In re Joshua Z.,26 Conn. App. 58, 63, 597 A.2d 842 (1991), cert. denied 221 Conn. 901
(1992). If at least one pleaded ground to terminate is found, the court must then consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both issues is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. State v. Anonymous, 179 Conn. 155, 172-173,425 A.2d 939 (1979); In re Juvenile Appeal (84-BC), 194 Conn. 252, 258,479 A.2d 1204 (1984); In re Nicolina T., 9 Conn. App. 598, 602,520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); In reEmmanuel M., 43 Conn. Sup. 108, 113, 648 A.2d 904, cert. denied231 Conn. 915, 648 A.2d 151 (1994).
For the reasons stated below, the court grants the petitions for termination of parental rights.
 I FACTUAL FINDINGS
At trial, DCF introduced numerous exhibits and the testimony of the assigned social worker, Marcus White; Stephanie Cohen, a substance abuse counselor at the ADRC outpatient clinic in Hartford; Velma Boyd, the boys' case manager for intensive foster care at the Village For Children and Families in Hartford; Dr. Bruce Freedman, the psychologist appointed by the court to evaluate Yolanda and the two children; Earline W., and Lisa K., the foster mothers, for Doyahn and Evron; and Susan Harrington, CT Page 14493 a child psychologist who supervised Doyahn's therapy at Wheeler Clinic. Yolanda testified and she introduced the testimony of two additional witnesses: Tenetia R., her older daughter, and Tamara K., her sister. She introduced no exhibits. The children's attorney called no witnesses and submitted no exhibits.
The credible and relevant evidence offered at trial, and a review of the judicially noticed court records, supports the finding of the following facts:
A. Case History
On January 15, 1997, petitions alleging neglect were filed by DCF on behalf of Doyahn and Evron. The petitions alleged that the boys were being denied proper care and attention, physically, educationally, emotionally and morally. On July 7, 1997, the court adjudicated the boys neglected, but they were allowed to remain in the care of their mother, Yoland, pursuant to an order of protective supervision. On December 4, 1997, motions for orders of temporary custody were filed, which were subsequently sustained on December 12, 1997. On February 23, 1998, a motion to modify the disposition to it commitment was granted. On February 23, 1999, the court granted an extension of the commitment. On February 8, 2000, DCF filed petitions to terminate parental rights.
DCF initially became involved with Yolanda's family in 1992 when Doyahn was born testing positive for cocaine in his system. For a time, a protective services case remained open. On May 5, 1994, a referral came to DCF from St. Francis Hospital after Evron was born testing positive for cocaine, alleging that Yolanda was abusing drugs and neglecting her children. At that time, Yolanda admitted that she used cocaine, but stated it was only "recreational" use. On November 4, 1995, DCF received a report from Patsy Darity, a school social worker at Martin Luther King School in Hartford, stating that Carla R., Yolanda's daughter, then age 13, had disclosed that her mother's boyfriend, Delray, had molested her on three separate occasions, touching her on her private parts, chest and buttocks. Delray moved out of the home and Carla was referred to counseling at the Village for Families and Children, but Yolanda never followed through with counseling for Carla. On January 15, 1997, as a result of Yolanda's continued substance abuse and failure to address Carla's molestation with counseling, neglect petitions were filed on behalf of Carla and the two boys. Carla also alleged physical abuse by Yolanda. On July 7, 1997, the three children were adjudicated neglected and protective supervision was ordered for six months. Carla was subsequently committed to DCF as a delinquent.
On November 4, 1997, DCF received a new referral from Carla's social CT Page 14494 worker at Long Lane stating that Carla's maternal grandfather, Earnest R., had molested her in his home in March of 1997. She stated that while sleeping in his bed she awoke to her grandfather "sucking on her breast' and her pants were down. Carla also disclosed an earlier incident when she was six years old, stating that her grandfather had taken her into the woods in Colchester and masturbated in front of her. DCF's investigation revealed that Tenetia R., Yolanda's oldest daughter, also had disclosed inappropriate touching by her maternal grandfather when she was 14. Yolanda was denying the occurrence of these events and still permitting access by the grandfather to Doyahn and Evron. This resulted in their removal from the home under an order of temporary custody in December of 1997 and their eventual commitments on February 23, 1998.
B. Mother, Yolanda R.
Yolanda R. was born on January 22, 1959 in Hartford. She spent a part of her childhood in Philadelphia, then attended Hartford schools through the 10th grade. Yolanda reports no traumatic events during her childhood. She has never been married, but has four children.
Yolanda's diminishing of the seriousness of her daughters' sexual abuse allegations, her transient lifestyle and her substance abuse have remained issues since DCF first intervened with her family.
On July 21, 1997 and February 23, 1998, Yolanda signed a set of expectations for reunification with her children, which the court accepted. These expectations were substantially similar. Yolanda agreed to keep all appointments with DCF and her attorney and keep her whereabouts known to both; visit the children as often as permitted; participate in parenting, individual, family and drug/alcohol counseling; submit to random drug screens; secure and maintain adequate housing and income; and not engage in any further substance abuse or criminal behavior. In 1998, she additionally agreed to sign releases so DCF could monitor her progress with services and she was to maintain and cooperate with a restraining order if Doyahn and Evron were returned home. Yolanda also received treatment plans in April and October of 1999 reminding her of these expectations. She has not been consistent in following through with services.
Yolanda has had several living arrangements, and presently does not have her own apartment, nor is she residing in an apartment of appropriate size for two boys. She had her own apartment for approximately six months, but lost the apartment when she failed to keep up the rental payments. At times, she has lived with her oldest daughter, friends, and a sister who also has an open DCF file. At the time of trial, Yolanda claimed she was living with a friend in a small apartment on Collins CT Page 14495 Street in Hartford. It is significantly reflective of her level of commitment that Yolanda still has not obtained appropriate housing since she has been working for a number of months and making a sufficient salary to do so. She now earns about $344.00 a week, with benefits, at Electroflex in Bloomfield, where she has been working for about 6 months.
Yolanda has been unable to overcome her addiction to cocaine for many years. In November of 1997, before the boys were removed from her home, she was referred to Wheeler Clinic but was discharged for lack of compliance in March of 1998. In April of 1998, Yolanda began substance abuse treatment at Community Health Services and was again discharged for non-compliance in June of 1999. In August of 1999, she again was referred to Wheeler Clinic, but left the evaluation before it was complete. She rescheduled this evaluation in August of 1999, but she arrived late. She did not attend the rescheduled appointment on September 3, 1999. She also failed to attend appointments for two hair tests in May and July of 1999. Referrals in 1999 to ADRC's Outreach Substance Abuse and the ABH/Project Safe programs were were unsuccessful due to Yolanda's lack of compliance.
Yolanda has also not followed through completely with appointments set by DCF. Counseling sessions were scheduled for her at Community Health Services in June of 1999, but she did not attend.
In April of 1999, DCF referred Yolanda to Catholic Family Services' reunification program, but she was denied admission because she had tested positive for cocaine in March of 1999. Catholic Family Services' reunification program requires six months of sobriety prior to admission. Yolanda tested positive for cocaine use again in August of 1999. In January of 2000, Yolanda was referred again for substance abuse treatment at ADRC. It was recommended that she attend weekly groups, but she missed half of her first six scheduled group sessions. In March of 2000, she tested positive for cocaine. Her attendance until May of this year became erratic. On October 11, 2000, Yolanda again was evaluated for treatment assessment at Project Safe, a division of ABH. She related that she has been using cocaine since her late twenties and that she was using about ten to fifteen dollars worth on a daily basis up until May of 2000. A test on October 11, 2000 was positive for cocaine. There is no evidence that Yolanda as of the date of trial was drug free or attending out patient treatment on a consistent basis.
Yolanda was also offered family therapy with Doyahn at the Village for Family and Children, but she did not attend.
DCF also offered and referred Yolanda to the Supportive Housing CT Page 14496 Program, but she was denied services because she was not engaged in substance abuse treatment at the time.
C. Father, Delray S.
Very little is known about the biological father, Delray S. His whereabouts have been unknown to DCF since 1999. The DCF social worker has attempted diligently to contact him via telephone, correspondence and an Internet search, but has been unsuccessful.
Delroy has seen his children on only two occasions since the boys have been in DCF's custody, once on May 19, 1998, and again on February 3, 1999. He has not recognized his sons on special occasions by sending them cards, gifts or letter, nor has he telephoned the children. He has not contacted DCF or the foster parents to inquire as to the boys' well-being. During his two visits, Delray evidenced little interest in his children, showed no warmth or affection for them, and the boys appeared to have only a minimal connection with their father. They did not play with him or seek comfort from him.
D. Dovahn R.
Doyahn tested positive for cocaine at birth. The pregnancy was unplanned. His infancy was normal and he was a strong and healthy baby. Doyahn is intelligent, energetic and articulate. Since his placement in 1997, he has been in seven different foster homes. Two prior psychiatric evaluations of Doyahn noted signs of post-traumatic symptoms, including enuresis, depression and sexual acting out. Three of his five placements disrupted due to his sexually inappropriate behavior, defiant and appositional and aggressive actions. Doyahn, when first placed, was with Evron. Despite Yolanda's assertion that her children were "fine" until placed, Doyahn, early in his placement, demonstrated sexual acting out behaviors on his younger brother, including trying to touch Evron inappropriately and simulating sexual movement while mounting Evron. Doyahn also intentionally urinated in his bed, in closets and on floors. He exhibited a noted dislike of younger children in general and was physically abusive to Evron.
Doyahn attended individual therapy at the Village to address his sexually acting out behaviors. He is currently attending a special education program and receiving therapy at Wheeler Clinic to address issues of suicidal ideation, depression, post traumatic stress disorder and aggression. He has been prescribed medication to address depression and hyperactivity. He receives weekly individual and group counseling and psychiatric services. His supervising therapist at Wheeler Clinic, Susan Harrington, opined that uncertainty as to permanency is bad for Doyahn. CT Page 14497 If Yolanda cannot care for him safely right now, another permanency plan with clarity would be in his best interest. Harrington feels that although Doyahn may benefit from contact with his mother, he is able to accept the reality of the need for alternative care, and is resilient enough to still form an attachment to others. If Yolanda were to continue to have contact with Doyahn after the termination of her rights, she would have to be supportive of a decision that he not be returned to her care and not try to undermine the efforts of his caretakers.
Doyahn has a close but conflicted relationship with his mother and looks forward to her scheduled visits. He has expressed an interest in seeing his father. Doyahn demonstrates jealously toward his young brother, Evron. Doyahn said he had only seen his father once since placement, but that sometimes at past visits his mother, if she had money, would help him call his father.
Doyahn's current foster placement is a specialized, therapeutic home under the auspices of the Village for Families and Children. He has shown progress, smiling more and playing outside, which he refused to do in his last placement. He expressed contentment with his current foster parents. His sexualized behavior has decreased. However, he requires close monitoring due to unsafe behaviors such as wandering far from the home without permission and playing with sharp objects and big sticks.
E. Evron R.
Evron is a bright, cheerful six year old. He has a marked speech impediment and is difficult to understand, but he receives speech therapy at his elementary school. At times, Evron displays oppositional and aggressive behaviors. Evron tested positive for cocaine at birth. The pregnancy was unplanned. Yolanda described Evron as being a "hyper" baby determined to get his own way. Evron has been in three different foster homes since he has been in DCF care. Presently, he is in a specialized foster home through the Village where he is doing well. Evron has become very bonded to his foster parents and there has been improvement in his behavior since he was placed there. Evron attended individual therapy at the Village to address the sexually inappropriate behavior his brother displayed toward him. He was discharged from individual therapy in February of 1999, and attended group therapy weekly at Community Mental Health center. Evron enjoys visit with his mother. He does not mention his father.
Evron's foster mother indicated that since he arrived in her home, he had settled down and was maintaining better eye contact, listening better and getting more in control of his anger. His speech, helped by therapy, was also improving. Byron attends the CAPS extended day treatment CT Page 14498 program, which requires meeting with the foster mother once a week. CAPS is recommending that Evron be placed on medication to control aggressive behavior. He attends a weekly anger management group and individual therapy once a month.
F. The Psychological Evaluation
Pursuant to an order of the court, Dr. Bruce Freedman, a psychologist, on May 26, 2000, conducted individual clinical evaluations of Yolanda and the two boys. Freedman also observed an interaction between Yolanda and the children.
Yolanda, when interviewed by Freedman, acknowledged many years of drug abuse and continuing use. She had recently relapsed after an effort at treatment. She also acknowledged an inability to obtain adequate housing.
Freedman administered several tests to her, which revealed a large number of significant emotional and mental problems. Yolanda's personality testing stands out as one of the worst test results Freedman has seen. She exhibited an unusual level of disturbed answers. She has particular problems in 5 clinical scales: physical or bodily distress, denying problems and refusing to face them, anger and bitterness, mental confusion and mistrust and suspicion. Freedman testified that Yolanda's profile is that of a "person who is going to have extreme difficulties getting along with other people and who is personally in a lot of emotional distress." Freedman noted this type of person is ordinarily seen in a hospitalized setting. Such a person would always be too preoccupied with her own problems to focus on the needs of children, especially children with special needs. Moreover, her intellectual deficits place her in the borderline range.
Doyahn met with Freedman and indicated he likes his present foster home and is angry with his mother for being on drugs and not straightening out. Freedman administered Doyahn a test for emotional development. Doyahn was asked to look at a series of pictures and describe what was happening in the pictures. Freedman said Doyahn's stories were the most disturbed set he'd ever seen in a child his age, depicting violent, dark scenarios. Freedman concluded that Doyahn, to avoid developing into an angry, violent adolescent, must have a very structured, secure and loving environment. He will need a very experienced, knowledgeable, capable parent to handle him and he must continue to receive regular therapy, to which he positively responds. Doyahn resented the presence of Evron. Evron at first was much calmer. Doyahn started to misbehave, and his anger and resentment became more pronounced. Yolanda became impatient, then angry with him. Eventually, Doyahn got so angry he was visibly CT Page 14499 shaking his fist and threatening his younger brother. Evron was frightened and Yolanda was not able to handle Doyahn or stop his angry pattern from escalating.
Freedman recommends termination of parental rights as' being in the best interest of both boys. There is no doubt, he stated, that these boys should live separately, since their interaction is destructive. It would also be hard for one home to handle both of them, since both require a lot of special care taking. Evron, Freedman feels, would suffer no long term effects of discontinued contact with his mother. Doyahn is more adamant about continuing to connect with her, but he is also very angry about her failure to regain his custody. He knows Yolanda didn't do what she needed to do to get him out of foster care. Although both Freedman and Harrington believe Doyahn should continue to have some contact with his mother, Freedman, the expert who actually observed Yolanda and Doyahn together, opined that any contact, if permitted, should be left up to the family caring for him and it should be very limited — no more than once or twice a year. The purpose of limited contact would only be to prevent the build up of fantasies in Doyahn that his mother is capable of caring for him. Limited contact would provide Doyahn with a reality check about Yolanda's capabilities as a parent and help him move on.
Yolanda was unable to handle her two boys capably for one hour, despite her unsubstantiated claim that she completed parenting classes, of which the DCF worker had no proof. Yolanda, according to Freedman, does not exhibit the self discipline and commitment to stabilize her lifestyle or abstain from the use of cocaine. Her older children display the effect of her poor parenting. This is a family that operated quite dysfunctionally for a very long time and has remained resistant to interventions. Freedman also had evaluated Yolanda in 1997, after the boys were first removed. At that time, she exhibited similar patterns: a chaotic living situation, poor judgment, and substance abuse. She was resistant to DCF's and the school's urging that she get help for her older daughter, Carla, resulting in court interventions.
In 1997, Freedman recommended individual and family counseling, and Yolanda has not complied with such services.
Carla was pregnant with an illegitimate child at the time of Freedman's May, 2000 evaluation. Yolanda told Freedman she was hoping to get an apartment for her and Carla before Carla delivered her baby. As of the date of trial, Yolanda had not accomplished this, an indication of her continued inability to address her children's needs.
Freedman concludes in his written report:
. CT Page 14500 . . her record as an independent adult, or as a consistent parent, was extremely poor. She repeatedly returned to drug abuse, failed to guide her older girls into healthy adult lives, and then, tried to rely herself on her oldest daughter while both were struggling financially. In truth, Ms. R. was no further along the path toward reunification today than when the children were first placed. While her children had shown many signs of distress and problems, she had been unable to take even simple steps to prepare to care for them.
Only one relative ever offered herself as a resource for the boys. Tenetia, their oldest sister, offered her home as a placement at the time of trial. She is a single mother with two illegitimate children of her own, ages 2 and 4. In the spring of this year, she was residing in a shelter with her two sons after being evicted. It would appear Tenetia has a full enough plate.
 II ADJUDICATION
Each statutory basis set out in General Statutes § 17a-112 (c) is an independent ground for termination. In re Baby Girl B., 224 Conn. 263,618 A.2d 1 (1992). The petitioner is required to prove one or more of the grounds alleged as to each parent in its petition by clear and convincing evidence.
A. Reasonable Efforts Finding
Unless a court has found in an earlier proceeding that efforts to reunify are no longer appropriate, DCF, in order to terminate parental rights, initially must show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. State. Sec. 17a-112 (c)(1). "Reasonable efforts means doing everything reasonable, not everything possible." In re Jessica B.,50 Conn. App. 554, 566, 718 A.2d 997 (1998).
On February 23, 1999, the court (Dyer, J.) found efforts were no longer appropriate for the father, Delray.
DCF has been monitoring Yolanda's parenting, or lack thereof, for almost a decade due to chronic substance abuse, medical neglect, sexual CT Page 14501 and physical abuse and homelessness.
With the assistance of counsel, Yolanda signed, for the second time, a form setting forth what was expected of her in order to regain custody of her children on February 23, 1998. These expectations were accepted and approved by-the court at the time of the boys' commitments. Yolanda never fully complied with any of these expectations, despite the numerous referrals described on pages 5 through 7 of this decision.
The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify Yolanda with Doyahn and Evron, both prior and subsequent to the filing of the termination petitions on February 8, 2000.
DCF's efforts were hindered by the parents' lack of cooperation, Delray's failure to keep his whereabouts known, and Yolanda's unwillingness to accept services or benefit from reunification efforts.
B. Abandonment — C.G.S. § 17a-112 (c)(A).
This ground, alleged as to the father, Delray, is established when the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child.
Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of "interest, concern or responsibility." In re Migdalia M., 6 Conn. App. 194, 209,504 A.2d 533 (1986).
 "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122
(1993); In re Roshawn R., 51 Conn. App. 44, 53, 720 A.2d 1112 (1998).
It is indisputable that Delray has fallen far short of the above standards for exhibiting interest, concern or responsibility. There have been no cards, no gifts, no letters or any financial support received CT Page 14502 from him. He visited the boys only twice and exhibited little concern or affection during those two occasions. His last visit was in February of 1999. He has failed to keep his whereabouts known to DCF and has not attended a single court date since the filing of the neglect petitions in 1997. Delray's efforts, such as they were, fail even to minimally fulfill any of the general obligations of parenthood.
Statutory abandonment on the part of Delray has been proven by clear and convincing evidence. He has not manifested a consistent, prolonged and reasonable degree of interest, concern or responsibility as to Doyahn's and Evron's welfare. In re Rayna M., 13 Conn. App. 23, 37-38,534 A.2d 897 (1987); In re Michael M., 29 Conn. App. 112, 121-123,614 A.2d 832 (1992).
C. Failure to Rehabilitate — C.G.S. § 17a-112 (c)(B).
This is the one ground for termination alleged against Yolanda. If the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding fails to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child, grounds for termination exist.
The evidence is clear and convincing that Doyahn and Evron were adjudicated neglected on July 7, 1997 and committed to DCF on February 23, 1998.
Personal rehabilitation, as used n the statute, refers to the restoration of the parent to a constructive and useful role as a parent.In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986).
Whether the age and needs of the child do not support allowance of further time for the parent to rehabilitate must also be considered. Inre Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). Also, in determining whether further allowance of a reasonable period of time would promote rehabilitation, a court can consider efforts made since the date of the filing of the petition to terminate parental rights. In re Sarah M.,19 Conn. App. 371, 377, 562 A.2d 566 (1989).
The evidence in this case is clear and convincing that Yolanda, as of the date of the filing of the termination petitions on February 8, 2000, had not achieved a reasonable degree of rehabilitation, and there is no evidence of conduct prior or subsequent to the date of the filing of the petition which would encourage the belief that within a reasonable period of time, considering the age and extensive needs of her sons, she could CT Page 14503 assume a responsible position in their lives.
A parent's compliance with expectations set after the adjudication of the neglect case, or the parent's success in fulfilling service agreements entered into with DCF are a relevant and important consideration in reaching a rehabilitation finding. In re Luis C.,
supra, 210 Conn. 167-168. The ultimate question is whether the parent at the time of the filing of the termination petition is more able to resume the responsibilities of parenting than they the parent was at the time of the commitment. In re Michael M., supra, 29 Conn. App. 126.
On pages 5 through 7, this decision discusses at length the attempts the court and DCF made to advise Yolanda what would be expected of her in order to have her children returned to their care, DCF's efforts to provide services, and Yolanda's lack of response both before and after the adjudicatory date.
The evidence is clear and convincing that Yolanda has not achieved a status where she is more able to parent Doyahn and Evron than she was at the time of their initial commitment, nor is there any evidence to conclude that rehabilitation into the role of a constructive parent could be achieved within a reasonable period of time. Dr. Freeman's analysis was devastatingly clear: Yolanda's limited ability to parent these two boys decreased the longer she let them languish in foster care. They now cannot reside together. Both of them would be too much for her to ever handle or allow them to grow into emotionally healthy individuals. There is no evidence that Yolanda has completed any recommended programs or services since the boys' removal and it is doubtful that she could cope with the multiplicity and demanding nature of their current emotional needs. In addition, she has done nothing to address her own significant addiction or personality problems. She is still homeless.
Further delay in this case in an attempt to succeed at rehabilitating an intransigent Yolanda would be severely injurious to Doyahn and Evron. After almost three years of foster care, it is imperative that Doyahn and Evron, who exhibit an array of specialized needs and developmental delays, have a permanent. stable and loving homes that can competently address their demanding therapeutic needs. Yolanda cannot handle the ordinary demands of life; the extraordinary situation would be overwhelming for her.
The ground alleged for termination of Yolanda's parental rights has been established by clear and convincing evidence.
D. No Ongoing Parent-Child Relationship
CT Page 14504
This is the second ground alleged against the Delray S. To prove this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 172-112(c)(3)(D); In re Savanna M.,55 Conn. App. 807, 815 (1999). This ground encompasses a situation in which regardless of fault, a child either has never know his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). The decisive questions is whether the child has present memories or feelings of a positive nature for the natural parent. In re Tabitha T.,51 Conn. App. 595, 602 (1999).
In this case, the evidence is clear and convincing that the required relationship between Evron and Doyahn and their biological father is absent. These boys have been in foster care for three and a half years. Delray visited them only twice, and has not seen or contacted his children for almost two years. He has contributed nothing to their physical, emotional, moral or educational development for a significant period of time. The boys do not ask about him or express an avid interest in seeing him. They are both bonded to their current foster fathers.
In deciding whether it would be in the children's best interests to permit further time for a relationship with Delray to redevelop, the court may consider several factors. In re Savanna M., 55 Conn. App. at 816. In light of the inordinate amount of time the boys have spent in foster care, the intensity of their special needs, the total lack of contact they have had with Delray, Carla's allegations of sexual molestation by Delray, and the lack of any positive relationship between him and his sons, it is clearly not in their best interests to permit additional time to pass in foster care in order to allow Delray, whose whereabouts are unknown, to attempt to reestablish a relationship. To the contrary, the evidence is clear that Delray has no ability to or interest in doing so.
 DISPOSITION
1. Section 17a-112 (d) Criteria
The court has found by clear and convincing evidence that all of the statutory grounds alleged by the petitioner for the termination of parental rights have been proven. CT Page 14505
Before making a decision whether or not to terminate Yolanda's and Delray's parental rights, the court must also consider and make findings on each of the seven criteria set forth in Sec. 17a-112 (d). In reRomance M., 229 Conn. 345, 355, 641 A.2d 378 (1994).
These criteria and this court's findings, which have been established by clear and convincing evidence, are as follows:
(1) "The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent."
DCF offered timely and appropriate services, to the extent possible, to facilitate reunification. The nature and extent of DCF efforts to engage both parents has been more fully discussed at pages 5 through 8 of this decision. DCF's efforts were thwarted thoroughly by the parents' lack of interest and cooperation, Yolanda's continued substance abuse and Delray's failure to keep DCF advised of his whereabouts.
(2) "Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended."
As noted in paragraph (1) above, DCF made reasonable efforts, to the extent possible, to reunite Yolanda with the boys. Delray was unable or unwilling to benefit from reunification efforts. On February 23, 1999, the court found that efforts toward reunification were no longer appropriate as to Delray.
(3) "The terms of any court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations."
Expectations were entered into and approved by the court for Yolanda at the time of the order of protective supervision in 1997. She also signed a similar expectations form in February of 1998. Delray never attended court, so expectations could not be set for him, and he has been whereabouts unknown for some time. Yolanda complied only minimally with her expectations, as more fully discussed on pages 5 through 7 of this decision.
(4) "The feelings and emotional ties of the child with respect to his parents, any guardians of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties." The federal Adoption Assistance and Child Welfare Act of 1980, CT Page 1450642 U.S.C. § 670 et. seq., as amended, mandates that after 12 months in foster care a child must have a plan for a permanent home. In reSamantha B., 45 Conn. Sup. 468, 479, 721 A.2d 1255 (1998). Foster care should be a strictly limited episode in the life of a child. Doyahn and Evron have a bond with their mother, and look forward to visits with her. However, Doyahn's prolonged, indefinite status also has caused him to resent his mother and brother. Evron is secure and attached to the K. foster family, where he has been placed since May of 1999. Doyahn only recently was placed with the W. family, but he is doing well there and exhibiting improved behavior.
(5) "The age of the child."
Doyahn, born on August 6, 1992, is 8. Evron, born on May 6, 1994 is 6.
(6) "The effort the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child."
Yolanda and Delray have made little effort to adjust their circumstances, conduct or conditions to make it in the best interest of either child to return home in the foreseeable future. Delray has disappeared. He has failed to maintain regular contact with his children, DCF or the foster home. He has not contributed any gifts or money toward the boys' support; and he did not send them any cards or letters. In rendering this decision on the grounds alleged for termination, this court found that the derelict conduct of Delray constituted statutory abandonment of his sons.
Yolanda has failed to address her cocaine addiction during the g years DCF has been involved with her family. She has continued to lead a transient lifestyle, despite earning a sufficient income to save for and procure adequate housing. While she visits the boys, bearing gifts, her interaction, as observed by Freedman, is unproductive and ineffective and elicits negative behavior, especially by Doyahn. She exhibits no understanding of the causes and effects of her boys' prolonged period of uncertainty. She certainly doesn't appreciate the extent of their emotional problems and the level of commitment it would take to manage both of them in the same home. At trial, she scoffed, in apparent disbelief, at the psychological testimony. Yolanda also is in need of individual therapy to address her own significant mental health issues. CT Page 14507 As of the date of trial, Yolanda had not engaged in therapy, despite therapy being recommended by Freedman in a 1997 evaluation.
(7) "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
There is no evidence that indicates that DCF or any other person interfered with either parent's ability to maintain a relationship with the boys by unreasonable acts or conduct. There is no evidence that economic circumstances have constituted a significant factor in either parent's failure to maintain a meaningful relationship with the children.
2. Best Interests of the Children
The court must now address the issue of whether the termination of parental rights is in the best interests of the children. This is the dispositional phase of a termination proceeding. In re Valerie D.,
supra, 223 Conn. 511.
With a statutorily mandated twelve month limit prior to the institution of a permanency plan, a period of three years is entirely unacceptable. These children's lack of permanency and the effects of that uncertainty no longer can be tolerated. Neither parent has exhibited any serious intention or prolonged progress toward achieving reunification, and these boys have suffered terribly, enduring numerous placements and frustrating visits that led nowhere. Whether or not the boys should have contact with their mother subsequent to this decision is entirely the decision of DCF and their adoptive or foster parents. Termination of parental rights means the severance of all parental rights, including visitation. While the court notes the boys' are both bonded with and express affection for their mother, maternal bonding alone is insufficient to deny these petitions in light of expert testimony that the-children's best interest will be served by finding them a permanent and stable, therapeutic placement as soon as possible, the fact that Yolanda has never seriously addressed her long standing substance abuse problem and the noted extent of Yolanda's own personality disorders. See In re Quanitra M.,60 Conn. App. 96 (2000). cite.
Based upon the foregoing findings, and having considered all the exhibits and testimony, the court concludes that the evidence is clear and convincing that the best interests of Doyahn and Evron are served by the termination of their mother's and father's parental rights so they may be free for adoption. The court notes that counsel for the children fully supports this result as in the best interests of the children so CT Page 14508 that they can be provided with a permanent and stable home as soon as possible.
 CONCLUSION
The petitions are granted and judgment may enter terminating Yolanda R.'s and Delray S.'s parental rights in Doyahn R. and Evron R. Pursuant to General Statutes Sec. 17a-112 (h), it is ordered that the commissioner of DCF be appointed statutory parent so that the boys can be placed for adoption. The statutory parent will file a written report to the court on or before December 21, 2000 at 9:00 A.M. on a case plan for Doyahn and Evron, and an in court review of the plan will be held on May 29, 2001 at 12:00 P.M. Additional plans will be filed in accordance with state and federal law until such time as adoptions are finalized.
KELLER, J.